## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ERIC RILEY,                         : Civil No. 1:24-CV-187
                                    :
     Plaintiff,               :
                                    :
  v.                             :
                                    : (Chief Magistrate Judge Bloom)
CAROLYN COLVIN, Acting              :
Commissioner of Social Security,[1] :
                                    :
     Defendant.               :

## MEMORANDUM OPINION

## I.  Introduction

On June 18, 2021, Eric Riley filed an application for disability and disability insurance benefits under Title II of the Social Security Act. A hearing was held before an Administrative Law Judge ("ALJ"), who found that Riley was not disabled from his alleged onset date, January 30, 2021, to February 13, 2023, the date the ALJ issued his decision.

Riley now appeals this decision, arguing that the decision is not supported by substantial evidence. After a review of the record, we

---

[1] Carolyn Colvin became the Acting Commissioner of the Social Security Administration on November 30, 2024. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Carolyn Colvin is substituted for Martin O'Malley as the defendant in this suit.

conclude that the ALJ's decision is not supported by substantial evidence. Therefore, we will remand this matter for further consideration by the Commissioner.

## II.  Statement of Facts and of the Case

On June 18, 2021, Riley applied for disability and disability insurance benefits, alleging disability due to left knee torn meniscus, high blood pressure, obesity, herniated discs, leg pain, irritable bowel syndrome, kidney stones, anxiety, difficulty sleeping, and difficulty walking and standing.  (Tr. 57). Riley was 50 years old on his alleged onset date of disability, had at least a high school education, and had past work as an oil delivery truck driver. (Tr. 27, 57).

The medical records underlying Riley's appeal revealed that Riley suffered a left knee injury, ultimately found to be a meniscus tear, while at work in January of 2021. (Tr. 572). Riley saw his treating physician, Dr. Brad Conner, D.O., several weeks after the incident, at which time Dr. Conner noted that Riley had been given a steroid injection and formal physical therapy that helped. (*Id*). A physical examination at this time revealed grossly intact sensation, minimal knee effusion, and 5/5

2

strength. (Tr. 573-74). Dr. Conner opined that Riley could return to work "full duty without restrictions" and recommended he wear a knee brace at work. (Tr. 574). However, roughly one month later, Riley returned to Dr. Conner complaining that his pain was worse than before. (Tr. 564). A physical examination showed grossly intact sensation, 5/5 strength, and minimal knee effusion, but Riley exhibited an antalgic gait. (Tr. 566). He was referred to a new physical therapist. (*Id.*).

Riley began treating with Waynesboro Physical Therapy in February of 2021 with physical therapist Derek Kling. (Tr. 387). At a February 19 appointment, Riley reported that his knee was "sore" and his symptoms were unchanged. (Tr. 390). PT Kling noted that Riley tolerated his therapy well without an increase in his symptoms. (*Id.*). At a follow up visit a few days later, PT Kling noted that Riley continued to have an antalgic gait but was able to progress to some strengthening without an increase in pain. (Tr. 391). In March, Riley reported some increased pain after he was jerked while walking his dog. (Tr. 395). After several visits, PT Kling wrote to Dr. Conner explaining that Riley had improved strength and nearly full range of motion and recommended

that he continue physical therapy. (Tr. 398). Ultimately, Riley underwent knee surgery with Dr. Conner in March. (Tr. 594).

At a follow up appointment for suture removal in April, it was noted that Riley was to attend physical therapy post-surgery, and that he would be off work for a minimum of eight weeks. (Tr. 600). A physical examination at this time revealed a mild antalgic gait, decreased sensation, no significant effusion, and 4/5 strength, and it was noted that Riley was using a crutch to assist him in walking. (*Id.*). At his initial physical therapy visit, Riley noted that he was feeling good after surgery but started to have worsening pain. (Tr. 404). Riley reported some improvement in his pain at his next visit, although he complained of difficulty with walking and performing activities of daily living. (Tr. 407). It was noted that Riley had an antalgic gait pattern due to stiffness, but his range of motion was progressing as expected. (Tr. 408). At a visit on April 26, Riley reported increased pain after therapy, which required him to take pain medications and use a walking stick. (Tr. 412). At this visit, PT Kling noted that Riley's range of motion was progressing, and his extension was nearing normal limits. (*Id.*).

4

In May, Riley reported continued soreness, and PT Kling noted that he "continues to display an antalgic gait pattern and is sufficiently challenged by his current program." (Tr. 420). Treatment notes from May 10 indicate that Riley felt he had improved about 50 percent since starting physical therapy, but that he continued to have pain with stairs, walking on uneven ground, and at random times. (Tr. 421). At this visit, PT Kling noted that Riley had met certain short-term goals, was progressing toward long term goals, but that strength, stability, and functional limitations remained. (Tr. 422).

Riley continued with therapy, during which it was noted that he experienced some increased pain after reports of doing yardwork and household chores, and he ultimately discontinued physical therapy in July in favor of receiving gel shots. (Tr. 425-33). He also continued to treat with Dr. Conner during this time, and Dr. Conner's treatment notes consistently revealed an antalgic gait and mild to moderate knee effusion, as well as grossly intact sensation and 5/5 strength. (Tr. 467, 474, 482). Treatment notes from Dr. Conner in July indicated that while Riley had some progress with physical therapy, his progress had

plateaued. (Tr. 458). Riley reported increased pain if he is on uneven ground or walking downhill, and that he used a walking stick. (Tr. 458-59). He further reported moderate effusion in his knee with increased activities. (Tr. 458). A physical examination revealed an antalgic gait, moderate knee effusion, grossly intact sensation, and 5/5 strength. (Tr. 461). Dr. Conner recommended permanent lifting restrictions of no more than 10 pounds, as well as seated or sedentary jobs with limited ambulation. (*Id.*). He provided Riley with a lubrication injection at this visit. (Tr. 461-62).

In October of 2021, Riley underwent an independent medical evaluation with Dr. Kevin Anbari, M.D. (Tr. 683-88). Dr. Anbari's physical examination noted that Riley brought a cane to the examination but was able to walk without it with slight antalgia, and he had mild knee effusion and 5/5 knee strength. (Tr. 684-85). Dr. Anbari opined that Riley's pain and functional limitations were likely due to osteoarthritis of the left knee, and that Riley had recovered from his left knee injury. (Tr. 687-88).

6

Riley subsequently underwent an internal medicine examination with Dr. Ahmed Kneifati, M.D., in November. (Tr. 690-99). Dr. Kneifati noted that Riley did not use an assistive device during the examination. (Tr. 690). Riley reported his activities of daily living to include cleaning twice per week, personal care daily, watching television, and social media. (Tr. 691). On examination, his gait was widened with short steps; he was able to stand and walk on his toes but was unsteady; his squat was limited to 45 percent; and he was able to rise from the chair without difficulty. (Tr. 692). Riley exhibited no effusion and 5/5 strength in his lower extremities. (*Id.*). Dr. Kneifati opined that Riley could lift and carry up to 20 pounds occasionally; could sit for 5 hours, stand for 3 hours, and walk for 2 hours in an 8-hour workday; did not require a cane to ambulate; and could perform occasional postural movements except he could never climb stairs, ramps, ladders, or scaffolds. (Tr. 694-97).

In April of 2022, Riley underwent an examination with Nurse Practitioner Christine Fahr. (Tr. 732-36). Riley reported that he used a cane but did not bring it with him to the examination. (Tr. 733). He reported that he did not need help at home, that he cooked and cleaned

daily and shopped once per week, and that he performs personal care daily. (Tr. 733-34). A physical examination revealed an antalgic gait, that he was able to do 25 percent of a full squat due to knee pain, that he could walk on his heels and toes with pain, and he had a normal stance. (Tr. 734). His lower extremity strength was 4/5, and he had no effusion or sensory deficits. (Tr. 735). NP Fahr opined that Riley could occasionally lift and carry up to 20 pounds; could sit for 8 hours, stand for 7 hours, and walk for 6 hours in an 8-hour workday; he did not need a cane to ambulate; and he could perform occasional postural movements except he could never crawl or climb ramps, stairs, ladders, or scaffolds. (Tr. 738-43).

During the alleged period of disability, Riley also treated with a counselor for an adjustment disorder and post-traumatic stress disorder. (Tr. 831-964). These treatment notes documented Riley's complaints of knee pain throughout the relevant period, as well as his activities of daily living, which included camping, taking RV trips with his wife, visiting

8

flea markets and breweries, and being the best man in his brother's wedding. (*Id.*).[2]

In January of 2023, PT Kling filled out a medical source statement regarding Riley's ability to do work related activities. (Tr. 827-28). PT Kling opined that Riley could sit for six hours and stand and walk for two hours in an 8-hour workday, would need to take breaks every 20 minutes, could occasionally lift, and carry up to 20 pounds, ad would need unscheduled breaks and walking breaks. (*Id.*). He further opined that Riley's pain would occasionally affect his focus and concentration, and that he would be absent one day per month. (Tr. 828).

It was against the backdrop of this evidence that the ALJ conducted a hearing on January 31, 2023, during which Riley and a Vocational Expert testified. (Tr. 34-56). Following the hearing, on February 13, 2023, the ALJ issued a decision denying Riley's application for benefits. (Tr. 12-33). At Step 1 of the of the sequential analysis that governs Social

---

[2] We limit our discussion of the plaintiff's mental health treatment notes to document his continued complaints of knee pain and activities of daily living, as the plaintiff's appeal is based solely on the ALJ's treatment of his physical impairments.

Security cases, the ALJ concluded that Riley did not engage in substantial gainful activity between January 31, 2021—the alleged onset date of disability—and the date the decision was issued. (Tr. 17). At Step 2, the ALJ found that Riley suffered from the following severe impairments: degenerative joint disease of the left knee and obesity. (Tr. 18). At Step 3, the ALJ concluded that none of Riley's severe impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 20).

Between Steps 3 and 4, the ALJ concluded that Riley:

> [H]a[d] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and he can occasionally balance, stoop, kneel, crouch, and climb ramps and stairs; and never crawl or climb ladders, ropes, or scaffolds. He can have no concentrated exposure to extreme cold, vibration, unprotected heights, or moving machinery parts.

(Tr. 20).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and Riley's reported symptoms. (Tr. 20-26). With respect to the medical opinion evidence, the ALJ found persuasive the opinions of the state agency consulting sources, Dr. Bilynsky and Dr. Smith. (Tr. 22). Dr.

Bilynsky opined in December of 2021 that Riley could perform a range of light work with occasional postural movements, except he could never climb ladders, ropes, and scaffolds and had certain environmental limitations. (Tr. 61-62). In May of 2022, on reconsideration, Dr. Smith opined that Riley could perform light work with occasional postural movements, except that he could never crawl or climb ladders, ropes, and scaffolds and had certain environmental limitations. (Tr. 73-74). Dr. Smith further noted that Riley should be allowed a cane "as needed to offload pain." (Tr. 74). The ALJ found that these opinions were supported by the longitudinal treatment notes showing intact sensation, full strength, capillary refill in less than three seconds, and no edema, and were consistent with Riley's activities of daily living. (Tr. 22-23).

The ALJ found the opinions of Dr. Kneifati and NP Fahr partially persuasive. (Tr. 23). The ALJ reasoned that these opinions were consistent with and supported by the treatment notes insofar as they limited Riley to a range of light work. (*Id.*). However, the ALJ noted that the remainder of these opinions overstated Riley's limitations and were inconsistent with his activities of daily living. (*Id.*).

Finally, the ALJ found the opinions of Dr. Conner and PT Kling unpersuasive. (Tr. 23-24). Regarding Dr. Conner's opinion that Riley was permanently limited to lifting no more than ten pounds, the ALJ found that this statement was inconsistent with treatment notes showing no acute distress, intact sensation, full strength, capillary refill in less than three seconds, and no erythema. (Tr. 23). He also reasoned that these limitations were inconsistent with Riley's activities of daily living. (Tr. 23-24). With respect to PT Kling's medical source statement, the ALJ characterized this statement as a checklist with minimal explanation, and further found that this opinion was not supported by PT Kling's own treatment notes or the plaintiff's activities of daily living. (Tr. 24).

The ALJ also considered Riley's symptoms, but ultimately found that the statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence. (Tr. 20-22). In making this determination, the ALJ considered Riley's testimony from administrative hearing. Riley testified that his knee pain disrupted his sleep, and that his obesity prevented him from getting around. (Tr. 40-42). He reported that his left knee was worse since

12

his surgery, and that he sometimes used a cane to get around, although it was not prescribed by a physician. (Tr. 44-46). He testified that he could do light housework, but that he cannot be on his feet very long. (Tr. 47, 49).

The ALJ found Riley' statements to be inconsistent with the objective clinical findings and his reported activities of daily living. (Tr. 21-22). In doing so, the ALJ focused heavily on Riley's activities of daily living, noting that he took camping and other trips, visited flea markets and breweries, and rode an e-bike, and that he was able to take care of his personal needs, operate a riding lawn mower, shop in stores, and grocery shop. (*Id.*). The ALJ also focused on examination findings in the record, including the early 2021 physical therapy notes from PT Kling, as well as the November 2021 and April 2022 consultative examination findings that showed full strength, no effusion, negative straight leg raise testing, and no sensory deficits. (Tr. 21).

Having made these findings, at Step 4 the ALJ found that Riley could not perform his past work but found at Step 5 that Riley could perform jobs in the national economy, such as a laminated machine

offbearer, a laundry folder, and a photocopy machine operator. (Tr. 27-28). Accordingly, the ALJ found that Riley had not met the stringent standard prescribed for disability benefits and denied his claim. (Tr. 28).

This appeal followed. On appeal, Riley argues that the ALJ erred in his consideration of the opinion evidence and failed to include adequate physical limitations in the RFC. After consideration, we conclude that the ALJ's opinion is not supported by substantial evidence. Accordingly, we will remand this matter to the Commissioner for further consideration.

III.   Discussion

  A. Substantial Evidence Review – the Role of This Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401

(1971).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted).  However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."  *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether Riley is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot reweigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

**B.** <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must

sequentially determine whether Riley: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine Riley' residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all Riley' medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of the analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

Riley bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that Riley can perform consistent with Riley' RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is

misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision.    Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79.  These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination.  On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence.  *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

C. <u>The ALJ's Decision is Not Supported by Substantial Evidence.</u>

As we have noted, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests," *Cotter*, 642 F.2d at 704, and the ALJ must "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999). After consideration, we conclude that the ALJ's RFC determination is not supported by an adequate explanation.

Here, Riley contends that the ALJ erred in finding the opinions of Dr. Conner and PT Kling unpersuasive. He asserts that the ALJ did not consider the abnormal examination findings from these providers and instead focused heavily on other findings as well as Riley's activities of daily living. Indeed, the ALJ consistently refers to examination findings showing "the claimant is in no acute distress with full strength, intact sensation, capillary refill in less than three seconds, and no edema." (Tr. 21-24). The ALJ also focused heavily on Riley's activities of daily living, including his ability to perform personal care, care for pets, make simple meals, and drive. (*Id.*). However, the decision contains no discussion

whatsoever of any of the abnormal examination findings in the record, such as treatment notes from Dr. Conner and PT Kling, as well as the internal medicine examinations, showing at times that Riley had mild to moderate effusion and an antalgic gait. (*See* Tr. 391, 404, 407-08, 420, 461, 474, 482, 566, 573-74, 600, 684-85, 692, 734).

While the ALJ was not required to accept the limitations as set forth in Dr. Conner's and PT Kling's opinions, in our view, the decision fails to adequately explain how the limitations set forth by these providers were inconsistent with their treatment records, specifically those records that contained abnormal examination findings. As we have explained, the ALJ must "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck*, 181 F. 3d at 433. Here, the ALJ did not discuss the abnormal examination findings from these treatment providers or those contained in the internal medicine examinations, and further, failed to articulate his reasons for rejecting these findings. Given that the ALJ failed to even mention the abnormal examination findings in the record, we cannot conclude that his assessment of these medical opinions is supported by

23

substantial evidence. *See e.g.*, *Altland v. Kijakazi*, 2023 WL 3163222, at
*11 (M.D. Pa. April 28, 2023) (Carlson, M.J.); *O'Dell v. Saul*, 2020 WL
6203098, at *7-8 (M.D. Pa. Oct. 22, 2020) (Arbuckle, M.J.).

Accordingly, a remand is required for further consideration of these
issues. While we reach this conclusion, we note that nothing in this
Memorandum Opinion should be deemed as expressing a judgment on
the ultimate outcome of this matter. Rather, that task is left to the ALJ
on remand.

## IV.  Conclusion

For the foregoing reasons, the decision of the Commissioner will be
REMANDED for further consideration.

An appropriate order follows.

*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge

Date: January 6, 2025